STEVE W. BERMAN (*pro hac vice* pending)
ASHLEY A. BEDE (*pro hac vice* pending)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
*steve@hbsslaw.com*
*ashleyb@hbsslaw.com*

ELAINE T. BYSZEWSKI (SBN 222304)
CHRISTOPHER R. PITOUN (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 203
Pasadena, CA 91101
Telephone:  (213) 330-7150
Facsimile:  (213) 330-7152
*elaine@hbsslaw.com*
*christopherp@hbsslaw.com*

Attorneys for Plaintiffs and the Proposed Class

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MELANIE BARBER, ROBERT AND ESTHER MALONE, and R. GRACE RODRIGUEZ, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NESTLÉ USA, INC., a Delaware Corporation; and NESTLÉ PURINA PETCARE CO., a Missouri Corporation,<br><br>Defendants. | Case No. 8:15-cv-1364<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT FOR VIOLATION OF CALIFORNIA CONSUMER PROTECTION LAWS**<br><br>DEMAND FOR JURY TRIAL |

1

2

**TABLE OF CONTENTS**

<u>Page</u>

I.     OVERVIEW ....................................................................................................... 1

II.    PARTIES ........................................................................................................... 4

III.   JURISDICTION AND VENUE ....................................................................... 6

IV.   FACTUAL ALLEGATIONS ........................................................................... 6

     A.    Forced Labor Is Used to Produce Nestlé's Fancy Feast Cat Food .............. 6

     B.    Nestlé Fails to Disclose the Use of Slave Labor in Its Supply Chain ......... 11

     C.    Nestlé Recognizes that the Use of Slave Labor in its Supply Chain Is Wrong .......... 13

     D.    Nestlé's Use of Slave Labor in Its Fancy Feast Supply Chain Is Material to Consumers .......... 16

V.    CLASS ACTION ALLEGATIONS ................................................................. 18

VI.   CAUSES OF ACTION ...................................................................................... 20

    FIRST CAUSE OF ACTION  VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW  (CAL. BUS. & PROF. CODE § 17200, *ET SEQ*.) .............. 20

    SECOND CAUSE OF ACTION  VIOLATIONS OF THE CONSUMERS LEGAL REMEDIES ACT  (CAL. CIV. CODE § 1750, *ET SEQ*.) .......... 22

    THIRD CAUSE OF ACTION  VIOLATIONS OF THE FALSE ADVERTSING LAW  (CAL. BUS. & PROF CODE §§ 17500, *ET SEQ*.) .......... 23

JURY TRIAL DEMAND ............................................................................................ 25

Plaintiffs Melanie Barber, Robert and Esther Malone, and R. Grace Rodriguez ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Nestlé USA Inc. and Nestlé Purina PetCare Co. (collectively, "Defendants" or "Nestle"). Plaintiffs' allegations against Defendants are based upon information and belief and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon each Plaintiffs' personal knowledge.

## I.      OVERVIEW

1.      America's largest and most profitable food conglomerates should not tolerate slave labor anywhere in their supply chains. These companies should not turn a blind eye to known human rights abuses or shirk from investigating potential human rights abuses by their suppliers, especially when the companies consistently and affirmatively represent that they act in a socially and ethically responsible manner. When these food conglomerates fail to uphold their responsibility for ensuring the absence of slave labor in their supply chains, their misconduct has the profound consequence of supporting and encouraging slave labor. And when these food conglomerates fail to disclose the use of slave labor in their supply chains to consumers, they are deceived into buying products they would not have otherwise and thereby unwittingly supporting slave labor themselves through their product purchases. Such food conglomerates should be required to make restitution to the consumers they have deceived and to ensure the absence of slave labor in their supply chains going forward.

2.      Nestlé is one of the largest and most profitable food conglomerates in the United States. Nestle sources its food products from all over the globe. Among its products, Nestlé markets and distributes pet foods, including the well-known cat food Fancy Feast. Fancy Feast comes in a variety of flavors and styles, many of which include seafood caught from the tropical waters between Thailand and Indonesia.

3.      Nestlé works with its Thai partner, Thai Union Frozen Products PCL ("Thai Union"), to import its pet food into the United States. In the past year, Thai Union has shipped more than 28 million pounds of seafood-based pet food for some of the top brands sold in America, including

Fancy Feast, according to United States Customs documents.[1]  Thai Union is Thailand's largest seafood company operating as a vertically integrated producer, processor, and exporter of canned seafood and pet food.[2]

4.       Thai Union has controlling stakes in seafood and pet food canneries, including Songkla Canning PCL and Thai Union Manufacturing Co., Ltd.  These canneries receive large shipments of fish from "motherships" which are larger boats that refrigerate and transport fish from numerous fishing boats.

5.       These motherships do not capture fish themselves.  Rather, they go between port and the fishing boats to resupply the fishing boats, pick up caught fish, and deliver the fish to the canneries for processing.  As a result, fishing boats do not need to return to port and can instead continuously fish, ensuring constant productivity with the ultimate goal of higher profits.  And because motherships eliminate the need for fishing boats to return to land for months at a time, the fishing boats operate at great distance from any port and without oversight.

6.       Thus, the supply chain can be depicted as follows:

Nestlé

↓

Thai Union Frozen Products

↓

Songkla Canning • Thai Union Mfg.

↓

Motherships

↓

Fishing Boats

---

[1] Ian Urbina, *'Sea Slaves': The Human Misery that Feeds Pets & Livestock*, New York Times (July 27, 2015), http://www.nytimes.com/2015/07/27/world/outlaw-ocean-thailand-fishing-sea-slaves-pets.html?_r=0 (last visited Aug.14, 2015).

[2] Thai Union Frozen Food Prods. PCL, Company Profile, http://www.thaiuniongroup.com/en/profile/subsidiaries.ashx (last visited Aug. 14, 2015).

7.      Without Nestlé holding its supply chain to a higher standard, the deckhands on these fishing boats end up working as modern day slaves, as described in the recent New York Times article, *'Sea Slaves': The Human Misery that Feeds Pets & Livestock*.[3]  Often trafficked from Thailand's poorer neighbors such as Cambodia and Burma, men and boys are sold to fishing boat captains needing crews to man their fishing boats.  The work is dangerous and exhausting with shifts lasting up to 20 hours a day with little or no pay.  Refusal or failure to work to a supervisor's satisfaction can result in being beaten or even murdered.

8.      The Bureau of International Labor Affairs of the United States Department of Labor confirms that fish and shrimp from Thailand are likely the product of forced labor.[4]

| Country | Good | Child Labor | Forced Labor |
|---------|------|-------------|--------------|
| Thailand | Fish | | X |
| Thailand | Garments | X | X |
| Thailand | Pornography | X | |
| Thailand | Shrimp | X | X |
| Thailand | Sugarcane | X | |

Likewise, Aidan McQuade, director of Anti-Slavery International, has commented that "[i]f you buy prawns or shrimp from Thailand, you will be buying the product of slave labour."

9.      Knowing that the much of the fish sold in Nestlé's pet food is likely the product of slave labor is material to consumers not wishing to support slave labor with their purchasing power. In the course of marketing and selling its pet foods, however, Nestlé materially omits and does not disclose the likelihood that much of the fish in its pet food is the product of slave labor. Furthermore, Nestlé does not disclose that despite its awareness that slave labor is being used in its supply chains, Nestlé has not required its suppliers to remedy this human tragedy.  Nestlé, as one of

---

[3] Ian Urbina, *'Sea Slaves':  The Human Misery that Feeds Pets & Livestock*, New York Times (July 27, 2015), http://www.ny times.com/2015/07/27/world/outlaw-ocean-thailand-fishing-sea-slaves-pets.html?_r=0 (last visited Aug.14, 2015).

[4] http://www.dol.gov/ilab/reports/child-labor/list-of-goods/countries/?q=Thailand.

the largest companies in the world, can dictate the terms by which seafood is produced and supplied to it, including the labor conditions in the supply chain.  But Nestlé is presently not able to trace the fish that it imports back to the fishing boats that source it, much less ensure that the fist is not the product of slave labor.  And meanwhile Nestlé continues to profit from the slave labor that supplies its fish. This is shameful.  Had Plaintiffs and Class Members known the truth, they would not have purchased Nestlé's pet food or paid as much for them.

10.     Nestlé's material omissions and failure to disclose is all the more appalling considering that Nestlé has identified the protection of human rights, including the elimination of all forms of forced or compulsory labor as one of its Corporate Business Principals.[5]  But Nestle does not live up to its own ideals.  Nestlé's public espousal of a message condemning forced labor and its superior knowledge of the likelihood that much of the fish in its pet food is so sourced obligate Nestle to disclose the truth to consumers.

11.     Nestlé's conduct described herein violates the (i) California's Business & Professions Code §§ 17200, *et seq.* (the Unfair Competition Law or "UCL"); (ii) California Civil Code §§ 1750, *et seq.* (the Consumers Legal Remedies Act or "CLRA"); and (iii) California's Business & Professions Code §§  17500, *et seq.* (the False Advertising Law or "FAL").  Plaintiffs bring this action on behalf of a California class for restitution and injunctive relief, and any other relief deemed appropriate by the court to which this case is assigned.

## II.     PARTIES

12.     Plaintiff Melanie Barber is and was at all relevant times a citizen of the State of California and resides in Lake Forest, California.  Ms. Barber has purchased Fancy Feast pet food from Nestlé at various retail stores including Target, Wal-Mart, and Ralphs from at least 2000 through present.  Ms. Barber saw the product packaging and labeling as well as signage in retail stores where she purchased the pet food.  Ms. Barber would not have purchased it or would not have

---

[5] The Nestlé Corporate Business Principles, June 2010, *available at* http://www.research. nestle.com/asset-library/documents/corporate-business-principles-en.pdf (last visited Aug. 17, 2015).

paid as much had Nestlé disclosed the truth.  Ms. Barber seeks restitution and injunctive relief requiring Nestlé to cease its deceptive marketing.

13.     Plaintiffs Robert and Esther Malone are and were at all relevant times citizens of the State of California and resides in Yuba City, California.  Mr. and Mrs. Malone have purchased Fancy Feast pet food from Nestlé at various retail stores including Pet Smart, Sams, Raleys, and PetCo from at least 2010 through present.  Mr. and Mrs. Malone saw the product packaging and labeling as well as signage in retail stores where they purchased the pet food.  Mr. and Mrs. Malone would not have purchased it or would not have paid as much had Nestlé disclosed the truth.  Mr. and Mrs. Malone seek restitution and injunctive relief requiring Nestlé to cease its deceptive marketing.

14.     Plaintiff R. Grace Rodriguez is and was at all relevant times a citizen of the State of California and resides in Chatsworth, California.  Ms. Rodriguez has purchased Fancy Feast pet food from Nestlé at various retail stores including Vons, Ralphs, Walgreens, and Wal-Mart from at least 2001 through present.  Ms. Rodriguez saw the product packaging and labeling as well as signage in retail stores where she purchased the pet food.  Ms. Rodriguez would not have purchased it or would not have paid as much had Nestlé disclosed the truth.  Ms. Rodriguez seeks restitution and injunctive relief requiring Nestlé to cease its deceptive marketing.

15.     Defendant Nestlé USA, Inc. is a nationwide manufacturer and distributor of food and beverage products.  Its corporate headquarters is located at 800 Brand Blvd., Glendale, CA 91203.

16.     Defendant Nestlé Purina PetCare Co. is a nationwide manufacturer and distributor of pet foods.  Upon information and belief, its corporate headquarters is located at 1 Checkerboard Sq., St. Louis, Missouri 63164.

17.     Defendants develop, market, and distribute the Fancy Feast cat food line through pet stores, grocery stores, and online in California and nationwide.  Fancy Feast products using seafood imported by Thai Union ("Fancy Feast") include, but are not limited to, the following:  (i) Fancy Feast Appetizers Tender Tongol Tuna Appetizer; (ii) Fancy Feast Appetizers White Meat Chicken and Flaked Tuna; (iii) Fancy Feast Appetizers Flaked Skipjack Tuna Appetizer; (iv) Fancy Feast Appetizers Seabass & Shrimp; (v) Fancy Feast Appetizers Steamed Wild Alaskan Salmon;

(vi) Fancy Feast Appetizers White Meat Chicken & Shredded Beef; (vii) Fancy Feast Appetizers Steamed Tilapia; (viii) Fancy Feast Flaked Gourmet Cat Food Fish & Shrimp Feast; (ix) Fancy Feast Flaked Broths Tuna & Vegetables; (x) Fancy Feast Flaked Broths Mackerel and Vegetables; (ix) Fancy Feast Flaked Broths Salmon Flake and Vegetables.

### III.   JURISDICTION AND VENUE

18.    This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because the amount in controversy for the Class exceeds $5,000,000, and the Class includes members who are citizens of a different state than Defendant.

19.    This Court has personal jurisdiction over Defendants because they have regional offices and conduct substantial business in this district and throughout the State of California.

20.    Venue is proper in this Court under 28 U.S.C. § 1391(b), because Defendants have marketed and sold pet food within this district, and a substantial number of the acts and omissions alleged herein occurred within this district.

### IV.   FACTUAL ALLEGATIONS

**A.    Forced Labor Is Used to Produce Nestlé's Fancy Feast Cat Food**

21.    The journey from "bait to plate" for American pet food products spans thousands of miles and involves numerous parties.  Sophisticated entities like Nestlé harness their vast resources to efficiently catch fish in far off Southeast Asian waters, process those fish into pet food, and transport that pet food for sale to the American consumer.

22.    This journey begins on fishing trawlers operating in the tropical waters in and around the Gulf of Thailand and the South China Sea near Indonesia.  These fishing trawlers undertake the actual task of capturing the mackerel, tuna, prawns another species of sea life from the ocean that go into canned seafood and pet food.[6]

---

[6] Ian Urbina, *'Sea Slaves':  The Human Misery that Feeds Pets & Livestock*, New York Times (July 27, 2015), http://www.nytimes.com/2015/07/27/world/outlaw-ocean-thailand-fishing-sea-slaves-pets.html?_r=0 (last visited Aug.14, 2015); Kate Hodal and Chris Kelly, *Trafficked into slavery on Thai trawlers to catch food for prawns*, The Guardian (June 20, 2014), http://www.theguardian.com/global-development/2014/jun/10/-sp-migrant-workers-new-life-enslaved-thai-fishing (last visited Aug.14, 2015).

23.     The crews of these fishing trawlers are very often men and boys who have been trafficked from nearby Myanmar and Cambodia.[7]  Desperate and vulnerable, these men and boys fall victim to human traffickers who prey upon their poverty by offering the prospect of employment in Thailand which would enable these people to help their families.  Instead of true employment, men and boys are sold as slaves by brokers and smugglers to fishing captains in Thai ports in need of labor.  Once sold, these men and boys (hereafter "Sea Slaves") enter a modern form of indentured servitude where they are required to work to pay off the price the captains paid to purchase them.  The Sea Slaves cannot leave the boats until their debt is paid.  After leaving port, these boats become floating prisons isolated by thousands of miles of open water.

24.     These Sea Slaves are frequently resold to other fishing boats while out at sea, often at higher prices than their price at port.  As a result, Sea Slaves are involuntarily forced into longer and longer periods of servitude as their debt grows and the price of their freedom becomes ever more elusive.  Often, these purchases are made in one of five locations that are the deepest parts of the oceans, the point farthest away from every shore.  Here, the Thai, Indonesian, and Vietnamese jurisdictions intersect, making enforcement and application of laws confusing – to the advantage of companies that rely on slave labor, like Thai Union.

25.     Daily life at sea is harsh by any standard.  Meals for Sea Slaves consist of one bowl of rice per day along with some unwanted fish.[8]  When water runs low, Sea Slaves often suck the unsanitary and foul-tasting ice chips used to freeze fish.  Sleeping in two hour shifts, quarters are cramped, hot and filled with rodents and other vermin.  The boats' engines operate constantly

---

[7] Ian Urbina, *'Sea Slaves':  The Human Misery that Feeds Pets & Livestock*, New York Times (July 27, 2015), http://www.nytimes.com/2015/07/27/world/outlaw-ocean-thailand-fishing-sea-slaves-pets.html?_r=0 (last visited Aug.14, 2015); Kate Hodal and Chris Kelly,  *Trafficked into slavery on Thai trawlers to catch food for prawns*, The Guardian (June 20, 2014), http://www.theguardian.com/global-development/2014/jun/10/-sp-migrant-workers-new-life-enslaved-thai-fishing (last visited Aug.14, 2015).

[8] Ian Urbina, *'Sea Slaves':  The Human Misery that Feeds Pets & Livestock*, New York Times (July 27, 2015), http://www.nytimes.com/2015/07/27/world/outlaw-ocean-thailand-fishing-sea-slaves-pets.html?_r=0 (last visited Aug.14, 2015); Kate Hodal and Chris Kelly,  *Trafficked into slavery on Thai trawlers to catch food for prawns*, The Guardian (June 20, 2014), http://www.theguardian.com/global-development/2014/jun/10/-sp-migrant-workers-new-life-enslaved-thai-fishing (last visited Aug.14, 2015).

1    emanating a deafening noise and periodically spewing black clouds of toxic fumes into the sleeping

2    quarters.  Sea Slaves work in all weather conditions enduring seasickness during rough seas and the

3    unrelenting heat of the tropical sun.  Beyond the boat, pirates are known to operate in the region.

4           26.    The work on these trawlers is extremely dangerous.[9]  As a preliminary matter, many

5    Sea Slaves do not know how to swim making any misstep potentially fatal.  Moreover, fishing

6    trawlers typically use weighted nets to capture anything that might be swimming along the ocean

7    floor.  Once the nets are raised to the surface, Sea Slaves will jump overboard to ensure that the nets

8    have closed properly.  If a Sea Slave becomes entangled in the mesh nets, he could be forced

9    underwater and drown before anyone would notice.  During rough seas, large waves can pound the

10   fishing trawlers and easily drag away anyone on deck unlucky enough to be in the wrong place at the

11   wrong time.  Nylon lines can sever fingers and open wounds on constantly wet hands.  Deeper cuts

12   are stitched up by Sea Slaves themselves, resulting in large numbers of infections.

13          27.    Boat captains and officers regularly engage in severe physical punishment of

14   insubordinate Sea Slaves.  Various forms of punishment include physical beatings, solitary

15   confinement in foul smelling fishing holds below deck for days on end, and shackling them by the

16   neck.[10]  In other cases, captains and their officers have been known to kill Sea Slaves.  Sick Sea

17   Slaves have been thrown overboard.  Others have been beheaded.  As overfishing has continued to

18

19

20          [9] Ian Urbina, *'Sea Slaves':  The Human Misery that Feeds Pets & Livestock*, New York Times
     (July 27, 2015), http://www.nytimes.com/2015/07/27/world/outlaw-ocean-thailand-fishing-sea-
21   slaves-pets.html?_r=0 (last visited Aug.14, 2015); United Nations Inter-Agency Project on Human
     Trafficking, *Exploitation of Cambodian Men at Sea: Facts about the Trafficking of Camodian Men*
22   *onto Thai Fishing Boats* (Apr. 22, 2009), http://www.no-
     trafficking.org/reports_docs/siren/siren_cb3.pdf.

23          [10] Ian Urbina, *'Sea Slaves':  The Human Misery that Feeds Pets & Livestock*, New York Times
     (July 27, 2015), http://www.nytimes.com/2015/07/27/world/outlaw-ocean-thailand-fishing-sea-
24   slaves-pets.html?_r=0 (last visited Aug.14, 2015); Kate Hodal and Chris Kelly,  *Trafficked into*
     *slavery on Thai trawlers to catch food for prawns*, The Guardian (June 20, 2014),
25   http://www.theguardian.com/global-development/2014/jun/10/-sp-migrant-workers-new-life-
     enslaved-thai-fishing (last visited Aug.14, 2015); United Nations Inter-Agency Project on Human
26   Trafficking, *Exploitation of Cambodian Men at Sea: Facts about the Trafficking of Camodian Men*
     *onto Thai Fishing Boats*, 1, 5 (Apr. 22, 2009) http://www.no-trafficking.org/reports_docs/siren/
27   siren_cb3.pdf.

28
     COMPLAINT FOR VIOLATION OF CALIFORNIA
     CONSUMER PROTECTION LAWS              - 8 -
     Case No.:
     010539-11 801972 V1

deplete populations of fish in the South China Sea,[11] Sea Slaves must endure these conditions for months at a time as fishing trawlers continue to operate further and further from coastlines.  The conditions are so severe that the United Nations has issued a call to action for Cambodian, Thai, and Malaysian governmental agencies to enforce the human rights laws and policies.[12]

28.     On the open ocean, the Sea Slaves are at the mercy of the captain or other officers.[13] Corrupt law enforcement officials are often complicit in the trafficking of sea slaves, while Thai maritime authorities are limited in their ability to patrol thousands of square miles of open water – which is precisely why these boats operate at such distances from coastlines.

29.     Once fish have been caught and stored by fishing trawlers, the boats then meet with so-called "motherships."[14]  Motherships do not fish.  Their purpose is merely to collect the fish from fishing trawlers, store them into their larger and better refrigerated cargo holds, and resupply the fishing boats.  They are vital to the fishing boats' ability to operate further and further from coastlines, away from prying law enforcement and any government authorities.

30.     Motherships do not inquire whether the fishing boat's labor force is comprised of Sea Slaves.  While motherships may meet up with both fishing boats using Sea Slaves and other boats

---

[11]  *See* Environmental Justice Foundation, *Pirates and Slaves:  How Overfishing in Thailand Fuels Human Trafficking and the Plundering of Our Oceans* (2015), 10 http://ejfoundation.org/ sites/default/files/public/EJF_Pirates_and_Slaves_2015.pdf (last visited Aug.17, 2015).

[12]  United Nations Inter-Agency Project on Human Trafficking, *Exploitation of Cambodian Men at Sea: Facts about the Trafficking of Camodian Men onto Thai Fishing Boats*, 1, 5 (Apr. 22, 2009) http://www.no-trafficking.org/reports_docs/siren/siren_cb3.pdf (last visited Aug. 17, 2015).

[13]  Ian Urbina, *'Sea Slaves': The Human Misery that Feeds Pets & Livestock*, New York Times (July 27, 2015), http://www.nytimes.com/2015/07/27/world/outlaw-ocean-thailand-fishing-sea-slaves-pets.html?_r=0 (last visited Aug.14, 2015); Kate Hodal and Chris Kelly, *Trafficked into slavery on Thai trawlers to catch food for prawns*, The Guardian (June 20, 2014), http://www.theguardian.com/global-development/2014/jun/10/-sp-migrant-workers-new-life-enslaved-thai-fishing (last visited Aug.14, 2015); United Nations Inter-Agency Project on Human Trafficking, *Exploitation of Cambodian Men at Sea: Facts about the Trafficking of Camodian Men onto Thai Fishing Boats*, 1, 5 (Apr. 22, 2009) http://www.no-trafficking.org/reports_docs/siren/siren_cb3.pdf (last visited Aug. 17, 2015).

[14]  Ian Urbina, *'Sea Slaves': The Human Misery that Feeds Pets & Livestock*, New York Times (July 27, 2015), http://www.nytimes.com/2015/07/27/world/outlaw-ocean-thailand-fishing-sea-slaves-pets.html?_r=0 (last visited Aug.14, 2015); Kate Hodal and Chris Kelly, *Trafficked into slavery on Thai trawlers to catch food for prawns*, The Guardian (June 20, 2014), http://www.theguardian.com/global-development/2014/jun/10/-sp-migrant-workers-new-life-enslaved-thai-fishing (last visited Aug.14, 2015).

using legitimately employed deckhands, once the fish is collected and stored, fish that is the product of forced labor is mixed with fish that is legitimately caught, making any kind of tracing impossible.[15] That Nestlé permits such mixing of sources in its supply chain renders it unable to assert that *any* fish imported from Thailand is not the product of slave labor.

31.    Motherships then haul their cargo to ports on the Thai coast. At port, the fish are loaded onto trucks bound for nearby canneries in order to be processed into canned pet food and seafood.[16]

32.    As reported by the New York Times, one Sea Slave learned that much of the fish on the boat where he was held captive was eventually sent to a cannery owned by Songkla Canning PCL.[17]  Songkla Canning PCL and Thai Union Manufacturing LTD are the cannery subsidiaries of Thai Union Frozen Products PCL (hereafter "Thai Union").[18]  Thai Union and its subsidiaries process, package, and export many of America's best known pet food brands, including Fancy Feast. In the past year, Thai Union has shipped more than 28 million pounds of seafood-based cat and dog food for many of these top brands according to United States Customs documents.[19]

33.    After Thai Union's canneries have processed the raw fish into Fancy Feast, Thai Union exports it to Nestlé in the United States.  Thai Union may export directly with Nestlé as a

---

[15] Ian Urbina, *'Sea Slaves': The Human Misery that Feeds Pets & Livestock*, New York Times (July 27, 2015), http://www.nytimes.com/2015/07/27/world/outlaw-ocean-thailand-fishing-sea-slaves-pets.html?_r=0 (last visited Aug.14, 2015); Kate Hodal and Chris Kelly,  *Trafficked into slavery on Thai trawlers to catch food for prawns*, The Guardian (June 20, 2014), http://www.theguardian.com/global-development/2014/jun/10/-sp-migrant-workers-new-life-enslaved-thai-fishing (last visited Aug. 14, 2015).

[16] Robin McDowell, Margie Mason, Martha Mendoza, *AP Investigation: Are slaves catching the fish you buy?* (Mar. 25, 2015), http://news.yahoo.com/ap-investigation-slaves-catching-fish-buy-011905896--finance.html  (last visited Aug. 14, 2015).

[17] Ian Urbina, *'Sea Slaves': The Human Misery that Feeds Pets & Livestock*, New York Times (July 27, 2015), http://www.nytimes.com/2015/07/27/world/outlaw-ocean-thailand-fishing-sea-slaves-pets.html?_r=0 (last visited Aug.14, 2015).

[18] Thai Union Frozen Food Prods. PCL, Company Profile, http://www.thaiuniongroup.com/en/profile/subsidiaries.ashx (last visited Aug. 14, 2015).

[19] Ian Urbina, *'Sea Slaves': The Human Misery that Feeds Pets & Livestock*, New York Times (July 27, 2015), http://www.nytimes.com/2015/07/27/world/outlaw-ocean-thailand-fishing-sea-slaves-pets.html?_r=0 (last visited Aug.14, 2015).

consignee.  Alternatively, Thai Union may export to Phil Patterson, Inc., a customs broker in Omaha, Nebraska that acts as a consignee to Nestlé's Fancy Feast shipments.[20]

34.     Upon arrival in the United States, the Fancy Feast enters Nestlé's distribution network and is shipped to retailers in California and throughout the United States.

**B.     Nestlé Fails to Disclose the Use of Slave Labor in Its Supply Chain**

35.     While Fancy Feast packaging states that it is a product of Thailand, a consumer reviewing the Fancy Feast packaging will find no mention of the likelihood that forced labor was used to catch the seafood going into the product.

**FIGURE 1: (FRONT OF CAN OF FANCY FEAST)**

**FIGURE 2: (BACK OF CAN OF FANCY FEAST SHOWING MADE IN THAILAND)**



---

[20] Phil Patterson Inc., Company Homepage, http://ppioma.com (last visited Aug. 17, 2015).

**FIGURE 3: (FRONT OF PURELY FANCY FEAST)**



**FIGURE 4: (BACK OF PURELY FANCY FEAST SHOWING MADE IN THAILAND)**



1

**FIGURE 5: (FRONT OF FANCY FEAST CLASSIC BROTHS)**

2

3

4



5

6

7

8

9

10

**FIGURE 6: (BACK OF FANCY FEAST CLASSIC BROTHS SHOWING MADE IN THAILAND)**

11



12

13

14

15

16

17

18        36.      Nowhere on the packaging for any of the Fancy Feast cat food products is there any

19    indication of the slave labor conditions of those people catching the fish that go into them.

20        37.      Similarly, Nestlé's website does not disclose the likelihood of slave labor in Nestlé's

21    Fancy Feast supply chain, despite Nestlé's superior knowledge, as compared to consumers, regarding

22    that supply chain.

23    **C.      Nestlé Recognizes that the Use of Slave Labor in its Supply Chain Is Wrong**

24        38.      Nestlé's corporate business principles explicitly forbid slave labor by its suppliers.

25    Nestlé identifies the protection of human rights in its business activities as one of its ten Corporate

26    Business Principles stating that "[Nestlé] fully support[s] the United Nations Global Compact's

27    (UNGC) guiding principles on human rights and labour and aim to provide an example of good

28

COMPLAINT FOR VIOLATION OF CALIFORNIA
CONSUMER PROTECTION LAWS              - 13 -
Case No.:
010539-11  801972 V1

human rights and labour practices throughout our business activities."[21]   In describing the relationship with Nestlé's suppliers, the Corporate Business Principles state that "[Nestlé" require[s] our suppliers, agents, subcontractors and their employees to demonstrate honesty, integrity and fairness, and to adhere to [Nestlé Supplier Code]."[22]

39.     For example, in Nestlé's Supplier Code of Conduct, Nestlé states that it "expects the Supplier to adhere to all applicable laws and regulations…and strive to comply with international and industry standards and practices."[23]   Nestlé further warns that it "reserves the right to verify compliance with the [Supplier] Code [of Conduct]" and that a "Supplier must under no circumstances use, or in any other way benefit, from forced labour…"[24] which it defines as "any form of indentured servitude such as the use of physical punishment, confinement, threats of violence as a method of discipline. . . ."[25] As alleged above, all of these practices occur in Nestlé's Fancy Feast supply chain.

40.     Additionally, Nestlé's Supplier Code of Conduct demands that suppliers are "capable to disclose all the potential sources of primary origins…associated with deliveries made" and "reserves the right to ask suppliers to create … full supply chain mapping back to origin to facilitate assessment of upstream supply chain compliance."[26]   As alleged above, because Nestle permits its sources to store, transport, and process fish caught by Sea Slaves alongside fish caught by legitimate fishing operators, such tracing is impossible.

---

[21] The Nestlé Corporate Business Principles, June 2010, 6, http://www.nestle.com/asset-library/documents/library/documents/corporate_governance/corporate-business-principles-en.pdf (last visited Aug. 17, 2015).

[22] The Nestlé Corporate Business Principles, June 2010,7, http://www.nestle.com/asset-library/documents/library/documents/corporate_governance/corporate-business-principles-en.pdf (last visited Aug. 17, 2015).

[23] The Nestlé Supplier Code of Conduct, Dec. 2013,1, http://www.nestle.com/asset-library/documents/library/documents/suppliers/supplier-code-english.pdf (last visited Aug. 17, 2015).

[24] The Nestlé Supplier Code of Conduct, Dec. 2013, 2, http://www.nestle.com/asset-library/documents/library/documents/suppliers/supplier-code-english.pdf (last visited Aug. 17, 2015).

[25] The Nestlé Supplier Code of Conduct, Dec. 2013,  3, http://www.nestle.com/asset-library/documents/library/documents/suppliers/supplier-code-english.pdf (last visited Aug. 17, 2015).

[26] The Nestlé Supplier Code of Conduct, Dec. 2013, 4, http://www.nestle.com/asset-library/documents/library/documents/suppliers/supplier-code-english.pdf (last visited Aug. 17, 2015).

41.     Nestlé's Responsible Sourcing Guidelines for fish and seafood demand that "[s]uppliers will ensure [that] there is no known sourcing from Illegal, Unreported and Unregulated ("IUU") fisheries and vessels."[27] As alleged above, its suppliers source from IUU vessels.

42.     In Nestlé's comprehensive "Nestlé in Society Full Report 2014," Nestlé lays out an extensive human rights program designed to protect human rights within its businesses.  Nowhere is Thailand mentioned in the human rights section of this document despite Thailand's identification by the U.S. State Department as a "Tier 3 source, destination, and transite country for men, women, and children subjected to forced labor and sex trafficking" with particular reference made to the fishing industry.[28] The report does note that CEO of Nestlé S.A. Paul Bulcke's statement to the United Nations Annual Forum on Business and Human Rights in which he stated in part that "[h]aving the right policies, procedures and management systems is good and necessary but it is not enough. It is the implementation, how you behave on the ground and the relationships you establish with different stakeholders, which create the trust necessary to be successful over time, as a company and as a society."[29]

43.     In summary, although Nestle recognizes that the use of slave labor in its supply chain is wrong and its corporate business principles explicitly forbid slave labor by its suppliers, it materially omits to disclose to consumers purchasing Fancy Feast the likelihood that slave labor was used to source the seafood making up the product.

---

[27] The Nestlé Responsible Sourcing Guidelines, Sept. 2013, 14, http://www.nestle.com/asset-library/documents/library/documents/corporate_social_responsibility/nestle-responsible-sourcing-guidelines.pdf (last visited Aug. 17, 2015).

[28] Nestlé In Society Full Report 2014, 195-215, http://storage.nestle.com/nestle-society-full-2014/index.html#195/z (last visited Aug. 17, 2015); *see* U.S. Dep't of State, Office to Monitor & Combat Trafficking in Persons, *2014 Trafficking in Persons Report*, http://www.state.gov/j/tip/rls/tiprpt/countries/2014/226832.htm (last visited Aug. 17, 2015). Other countries ranked as Tier 3 for forced labor include North Korea and Iran.  U.S. Dep't of State, Office to Monitor & Combat Trafficking in Persons, *2014 Trafficking in Persons Report*, http://www.state.gov/j/tip/rls/tiprpt/countries/2014/226832.htm (last visited Aug. 17, 2015).

[29] Nestlé In Society Full Report 2014, 214, http://storage.nestle.com/nestle-society-full-2014/index.html#195/z (last visited Aug. 17, 2015).

**D.      Nestlé's Use of Slave Labor in Its Fancy Feast Supply Chain Is Material to Consumers**

44.      Consumers have become sensitive to the human cost behind the products that they buy.  This sensitivity transcends industries and ranges from products as diverse as clothing to coffee.

45.      A 2006 study by researchers at the University of Michigan analyzed consumer purchases to determining consumer willingness to pay a premium for athletic socks marked with a Good Working Conditions ("GWC") label.[30]  The study concluded that 30% of consumers in a working class neighborhood of Detroit were willing to pay a 20% price premium (from $1.00 to $1.20) for GWC labeled socks compared to non-GWC labeled socks.[31]

46.      A 2011 study lead by researchers at Harvard University studied consumer willingness to pay a premium for polo shirts sold with an SA8000 certification on eBay.[32]  The SA8000 certification prohibits the use of child labor and forced labor and discrimination based on race, gender, and religion.  The code mandates that workers be allowed to organize and bargain collectively with their employers.  The SA8000 code also requires that workplaces satisfy minimum health and safety standards, pay minimum (living) wages, and that overtime work is voluntary, limited, and paid at a premium.[33]  "On average, shoppers paid a 45% premium for labeled versus unlabeled shirts.  The findings suggest that there is substantial consumer support for fair labor standards, even among price-sensitive eBay shoppers."[34]

---

[30] Howard Kimeldorf, Rachel Meyers, Monica Prasad, & Ian Robinson, *Consumers with a Conscience: Will They Pay More?* (Winter 2006), 24 *available at* http://www.npr.org/documents/ 2013/may/consumer_conscience_study_ME_20130501.pdf (last visited Aug. 17, 2015).

[31] Howard Kimeldorf, Rachel Meyers, Monica Prasad, & Ian Robinson, *Consumers with a Conscience: Will They Pay More?* (Winter 2006), 24 *available at* http://www.npr.org/documents/ 2013/may/consumer_conscience_study_ME_20130501.pdf (last visited Aug. 17, 2015).

[32] Michael J. Hiscox, Michael Broukhim, Claire S. Litwin. Andrea Woloski, *Consumer Demand For Fair Labor Standards: Evidence From a Field Experiment on eBay* (Apr. 2011), 3 http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1811788 (last visited Aug. 17, 2015).

[33] Michael J. Hiscox, Michael Broukhim, Claire S. Litwin. Andrea Woloski, *Consumer Demand For Fair Labor Standards: Evidence From a Field Experiment on eBay* (Apr. 2011), 3 http://papers. ssrn.com/sol3/papers.cfm?abstract_id=1811788 (last visited Aug. 17, 2015).  (citing http://www.sa-intl.org/_data/n_0001/resources/live/2008StdEnglishFinal.pdf) (last visited Aug. 17, 2015).

[34] Michael J. Hiscox, Michael Broukhim, Claire S. Litwin. Andrea Woloski, *Consumer Demand For Fair Labor Standards: Evidence From a Field Experiment on eBay* (Apr. 2011), 3, 22.

47.     Another Harvard University study led by a similar team studied consumer willingness to pay a premium for coffee certified as Fair Trade on eBay.[35]  A Fair Trade certification requires, amongst other things, that the producer not use forced and child labor in the production of its coffee.[36]  The study found that consumers in online auctions were willing to pay an average of 23% more for coffee certified as Fair Trade.[37]

48.     Similar to products like socks and coffee, pet food is an inexpensive good generally imported from foreign countries where labor costs are considerably cheaper.  Accordingly, consumers are similarly sensitive to slave labor being used in pet food production.

49.     A survey by FishWise, a non-profit marine conservation organization, further explains the depths of consumer concerns regarding human rights abuses in supply chains.  FishWise surveyed consumers, the seafood industry and non-governmental organizations.[38]  Eighty-eight percent of consumers stated that they would stop buying a product if it was associated with human rights abuses.[39]  The survey further revealed that 70% percent of consumers would pay more for a product certified to be free of human rights abuses.[40]  FishWise noted that, "survey results indicate that human rights are important to seafood consumers and many of them are willing to avoid high risk products and pay more for those that are certified to be free of abuses."[41]

---

[35] *See* Michael J. Hiscox, Michael Broukhim,& Claire S. Litwin, *Consumer Demand for Fair Trade: New Evidence From A Field Experiment Using eBay Auctions of Fresh Roasted Coffee* (Mar. 16, 2011), http://scholar.harvard.edu/files/hiscox/files/ consumerdemandfairlaborstandardsevidencecoffee.pdf (last visited Aug. 17, 2015).

[36] Michael J. Hiscox, Michael Broukhim,& Claire S. Litwin, *Consumer Demand for Fair Trade: New Evidence From A Field Experiment Using eBay Auctions of Fresh Roasted Coffee* (Mar. 16, 2011), 4, http://scholar.harvard.edu/files/hiscox/files/ consumerdemandfairlaborstandardsevidencecoffee.pdf (last visited Aug. 17, 2015).

[37] Michael J. Hiscox, Michael Broukhim,& Claire S. Litwin, *Consumer Demand for Fair Trade: New Evidence From A Field Experiment Using eBay Auctions of Fresh Roasted Coffee* (Mar. 16, 2011) 3, 23, http://scholar.harvard.edu/files/hiscox/files/ consumerdemandfairlaborstandardsevidencecoffee.pdf (last visited Aug. 17, 2015).

[38] FishWise, *Trafficked II: An updated summary of human rights abuses in the seafood industry* (2014), at p. 5, available at http://www.fishwise.org/services/human-rights.

[39] *Id*. at 6.

[40] *Id*.

[41] *Id*. at 7.

50.     Nestlé is well aware of this consumer sensitivity and has mounted its extensive public relations effort to position itself as a company that is invested in eradicating slavery from its supply chain.  Its hollow statements mask a tragic truth that keeps thousands of impoverished men and boys trapped on the open sea with little or no hope of ever returning home.  Had consumers known the truth, they would not have purchased or paid as much for Fancy Feast.

## V.     CLASS ACTION ALLEGATIONS

51.     Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek certification of a Class defined as follows:

> All consumers who purchased seafood based Fancy Feast Cat Food in California during the four years prior to the filing of the complaint.

52.     Excluded from the Class are Defendants; the officers, directors or employees of Defendants; any entity in which Defendants has a controlling interest; and any affiliate, legal representative, heir or assign of Defendants.  Also, excluded from the Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

53.     Plaintiffs do not know the exact number of Class Members at the present time.  However, due to the nature of the trade and commerce involved, there appear to be thousands of Class Members such that joinder of all Class members is impracticable.

54.     The Class is ascertainable by objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other consumer fraud cases and complex class actions, and through Nestlé's business records.

55.     There are questions of law and fact common to the Class.  Defendants' unlawful omissions similarly impact Class Members, all of who purchased one or more Fancy Feast products.

56.     Plaintiffs assert claims that are typical of the Class.  Plaintiffs and all Class Members have been subjected to the same wrongful conduct because they all have purchased Defendants' Fancy Feast that was not disclosed as likely sourced from suppliers using forced labor.  As a result,

and like other members of the Class, Plaintiffs purchased and paid an amount for Fancy Feast products which they otherwise would not have paid.

57. Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs are represented by counsel competent and experienced in both consumer protection and class action litigation.

58. Class certification is appropriate because Defendants have acted on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

59. Class certification is also appropriate because common questions of law and fact substantially predominate over any questions that may affect only individual members of the Class, including, *inter alia*, the following:

    a. Whether Defendants failed to disclose the likelihood that Sea Slaves were used in its Fancy Feast supply chain;

    b. Whether the likelihood that Sea Slaves were used in Nestlé's Fancy Feast supply chain would be material to a reasonable consumer;

    c. Whether Defendants had a duty to disclose the likelihood that Sea Slaves were used in its Fancy Feast supply chain;

    d. Whether Defendants' nondisclosures were likely to deceive a reasonable consumer;

    e. Whether Defendants' conduct violates the UCL, FAL and CLRA;

    f. Whether the challenged practices harmed Plaintiffs and members of the Class; and

    g. Whether Plaintiffs and members of the Class are entitled to restitutionary, injunctive, or other relief.

60. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class Members is impracticable. Furthermore, because the restitution and/or damages suffered, and continue to be suffered, by each individual Class Member may be relatively small, the expense and burden of individual litigation

COMPLAINT FOR VIOLATION OF CALIFORNIA
CONSUMER PROTECTION LAWS        - 19 -
Case No.:
010539-11 801972 V1

would make it very difficult or impossible for individual Class Members to redress the wrongs done to each of them individually and the burden imposed on the judicial system would be enormous.

61.     The prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendants.  In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200, *et seq.*)

62.     Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

63.     Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practice."  Defendants have engaged in unlawful, and unfair, and fraudulent business acts and practices in violation of the UCL.

64.     Defendants have violated the unlawful prong by virtue of its violations of the CLRA, as described below.

65.     Defendants have violated the unfair prong of section 17200 because the acts and practices set forth in the Complaint offend established public policies against the use of slave labor and the sale of products tainted by the use of slave labor and supporting truth in advertising to consumers.  Defendants' participation in a supply chain involving slave labor is immoral, unethical, oppressive, unscrupulous and injurious to consumers.  The harm that these acts and practices cause greatly outweighs any benefits associated with them.  Nestlé's conduct also impairs competition within the market for pet food, and prevents Plaintiffs and Class Members from making fully informed decisions about the kind of pet food to purchase or the price to pay for such products.

66.     Defendants have violated the fraudulent prong of section 17200 because, as set forth above, its material omissions were likely to deceive a reasonable consumer and the true facts would be material to a reasonable consumer.

67.     Defendants had a duty to disclose the likelihood of forced labor in their supply chain, arising from (1) their superior knowledge of Nestlé's supply chain and the practices of its suppliers as compared to consumers, *e.g.* through Nestlé's years of experience marketing and distributing seafood-based pet food manufactured in Thailand; and (2) their partial representations and/or misrepresentations to the contrary, *e.g.,* numerous corporate statements intended to show that Nestlé does not tolerate use of forced labor by its suppliers.

68.     As alleged herein, Nestlé failed to disclose the likelihood of slave labor in its supply chain for Fancy Feast.  Nor does Nestle disclose that despite its awareness of slave labor in its Fancy Feast supply chains, it has not required its suppliers to remedy the ongoing human rights abuses.

69.     These omissions would be material to a reasonable consumer.

70.     Reasonable consumers are likely to be deceived by Defendants' material omissions.

71.     Plaintiffs have suffered injury in fact, including the loss of money, as a result of Defendants' unlawful, unfair, and/or deceptive practices.  Plaintiffs and members of the Class were directly and proximately injured by Nestlé's conduct and lost money as a result of Nestlé's material omissions, because they would not have purchased nor paid as much for Fancy Feast had they known the truth.

72.     All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.  Defendants' wrongful conduct is part of a general practice that is still being perpetuated and repeated throughout the State of California.

1      73.    Plaintiffs request that this Court enter such orders or judgments as may be necessary

2  to enjoin Defendants from continuing its unfair and deceptive business practices, to restore to

3  Plaintiffs and members of the Class any money that Defendants acquired by unfair competition, and

4  to provide such other relief as set forth below.

5      74.    Plaintiffs are entitled to an award of reasonable attorneys' fees under California Code

6  of Civil Procedure Section 1021.5 for the benefit conferred upon the general public of the State of

7  California by any injunctive or other relief entered herein.

8                          **SECOND CAUSE OF ACTION**

9              **VIOLATIONS OF THE CONSUMERS LEGAL REMEDIES ACT**
               **(CAL. CIV. CODE § 1750, *et seq.*)**

10     75.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

11     76.    Defendants are "persons" under Cal. Civ. Code § 1761(c).

12     77.    Plaintiffs are "consumers," as defined by Cal. Civ. Code § 1761(d), who purchased

13  Defendants' Fancy Feast.

14     78.    Cal. Civ. Code § 1770(a)(2) prohibits "[m]isrepresenting the source, sponsorship,

15  approval, or certification of goods or services."

16     79.    Cal. Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have

17  sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not

18  have…."

19     80.    Cal. Civ. Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a

20  particular standard, quality, or grade, or that goods are of a particular style or model, if they are of

21  another."

22     81.    Nestlé violated these provisions of the CLRA by misrepresenting the source,

23  characteristics, and standard of its Fancy Feast in omitting disclosure of material aspects thereof.

24     82.    As alleged herein, Nestlé failed to disclose the likelihood of slave labor in its supply

25  chain for Fancy Feast.  Nor does Nestle disclose that despite its awareness of slave labor in its Fancy

26  Feast supply chains, it has not required its suppliers to remedy the ongoing human rights abuses.

27

28

COMPLAINT FOR VIOLATION OF CALIFORNIA
CONSUMER PROTECTION LAWS                    - 22 -
Case No.:
010539-11  801972 V1

83.     These omissions would be material to a reasonable consumer.

84.     Reasonable consumers are likely to be deceived by Defendants' material omissions.

85.     Plaintiffs and members of the Class were directly and proximately injured by Nestlé's conduct and lost money as a result of Nestlé's material omissions, because they would not have purchased nor paid as much for Fancy Feast had they known the truth.

86.     In accordance with Civil Code § 1780 (a), Plaintiffs and Class Members seek restitutionary, injunctive and equitable relief for Nestlé's violations of the CLRA.  Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by means of such unfair business practices, and for such other relief, including attorneys' fees and costs, as provided in Civil Code § 1780 and the Prayer for Relief.  In addition, after mailing appropriate notice and demand in accordance with Civil Code § 1782(a) & (d), Plaintiffs will amend this Class Action Complaint to include a request for damages.

87.     Plaintiffs include an affidavit with this Complaint reflecting that venue in this District is proper, to the extent such an affidavit is required by Cal. Civ. Code § 1780(d) in federal court.

### THIRD CAUSE OF ACTION

### VIOLATIONS OF THE FALSE ADVERTSING LAW
### (CAL. BUS. & PROF CODE §§ 17500, *et seq.*)

88.     Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

89.     California Business & Professions Code §§ 17500, *et seq.* (the "FAL") broadly proscribes deceptive advertising in this State.  Section 17500 makes it unlawful for any corporation intending to sell products or perform services to make any statement in advertising those products or services concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or not to sell those products or services as advertised at the price stated therein, or as so advertised.

90.     When the seller has a duty to disclose material facts about a product, the sale of the product to consumers without disclosure of such material facts runs afoul of the FAL.

91.     As alleged herein, Nestlé failed to disclose the likelihood of slave labor in its supply chain for Fancy Feast.  Nor does Nestle disclose that despite its awareness of slave labor in its Fancy Feast supply chains, it has not required its suppliers to remedy the ongoing human rights abuses.

92.     Defendants had a duty to disclose the likelihood of forced labor in their supply chain, arising from (1) their superior knowledge of Nestlé's supply chain and the practices of its suppliers as compared to consumers, *e.g.* through Nestlé's years of experience marketing and distributing seafood-based pet food manufactured in Thailand; and (2) their partial representations and/or misrepresentations to the contrary, *e.g.,* numerous corporate statements intended to show that Nestlé does not tolerate use of forced labor by its suppliers.

93.     These omissions would be material to a reasonable consumer.

94.     Reasonable consumers are likely to be deceived by Defendants' material omissions.

95.     Defendants know or reasonably should know that the marketing and sale of its Fancy Feast was and is deceptive.

96.     Plaintiffs have suffered injury in fact, including the loss of money, as a result of Defendants' unlawful, unfair, and/or deceptive practices.  Plaintiffs and members of the Class were directly and proximately injured by Nestlé's conduct and lost money as a result of Nestlé's material omissions, because they would not have purchased nor paid as much for Fancy Feast had they known the truth.

97.     All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.  Defendants' wrongful conduct is part of a general practice that is still being perpetuated and repeated throughout the State of California.

98.     Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing its deceptive advertising, to restore to Plaintiffs and members of the Class any money that Defendants unlawfully acquired, and to provide such other relief as set forth below.

1    99.    Plaintiffs entitled to an award of reasonable attorneys' fees under California Code of

2    Civil Procedure Section 1021.5 for the benefit conferred upon the general public of the State of

3    California by any injunctive or other relief entered herein.

4    **PRAYER FOR RELIEF**

5    WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated,

6    respectfully request that this Court enter a judgment against Defendants and in favor of Plaintiffs,

7    and grant the following relief:

8    A.    Determine that this action may be maintained as a class action with respect to the

9    Class identified herein and certify it as such under Rules 23(b)(2) and/or 23(b)(3), or alternatively

10   certify all issues and claims that are appropriately certified, and designate and appoint Plaintiffs as

11   Class Representatives and their counsel as Class Counsel;

12   B.    Declare, adjudge and decree the conduct of Defendants as alleged herein to be

13   unlawful, unfair and/or deceptive;

14   C.    Enjoin Defendants from continuing the unfair and deceptive marketing and sale of its

15   Fancy Feast;

16   D.    Award Plaintiffs and the Class restitution of all monies paid to Defendants as a result

17   of its unfair and deceptive business practices;

18   E.    Award Plaintiffs and the Class reasonable attorneys' fees, costs, and pre- and post-

19   judgment interest; and

20   F.    Award Plaintiffs and the Class such other further and different relief as the nature of

21   the case may require or as may be determined to be just, equitable, and proper by this Court.

22   **JURY TRIAL DEMAND**

23   Plaintiffs, by counsel, request a trial by jury for all claims so triable.

24

25

26

27

28

1    DATED: August 27, 2015                    HAGENS BERMAN SOBOL SHAPIRO LLP

2                                              By: */s/ Elaine T. Byszewski*
                                               Elaine T. Byszewski (SBN 222304)
3                                              Christopher R. Pitoun (SBN 290235)
                                               301 N. Lake Avenue, Suite 203
4                                              Pasadena, CA  91101
                                               Telephone:  (213) 330-7150
5                                              elaine@hbsslaw.com
                                               christopherp@hbsslaw.com
6
                                               Steve W. Berman (*pro hac vice*)
7                                              Ashley A. Bede (*pro hac vice*)
                                               HAGENS BERMAN SOBOL SHAPIRO LLP
8                                              1918 Eighth Avenue, Suite 3300
                                               Seattle, WA  98101
9                                              Telephone:  (206) 623-7292
                                               *steve@hbsslaw.com*
10                                             *ashleyb@hbsslaw.com*

11
                                               *Attorneys for Plaintiffs and the Proposed Class*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF CALIFORNIA
CONSUMER PROTECTION LAWS                         - 26 -
Case No.:
010539-11  801972 V1

1

**DECLARATION RE: CLRA VENUE**

2      I, Melanie Barber, do hereby declare and state as follows:

3          1.      I am a party plaintiff in the above captioned action.  Pursuant to Cal. Civ. Code §

4 1780(d), I make this declaration in support of the Class Action Complaint and the claim therein for

5 relief under Cal. Civ. Code § 1780(a).  I have personal knowledge of the facts stated herein and, if

6 necessary, could competently testify thereto.

7          2.      This action for relief under Cal. Civ. Code § 1780(a) has been commenced in a county

8 that is a proper place for trial of this action because Nestlé Holdings, Inc., Nestlé USA Inc., Nestlé

9 Purina PetCare Co. do business throughout the State of California.

10      This declaration is signed under penalty of perjury under the laws of the State of California

11 this 27 day of August 2015.

12

13

14                                         Melanie Barber

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION RE: CLRA VENUE

I, Robert Malone, do hereby declare and state as follows:

     1.     I am a party plaintiff in the above captioned action.  Pursuant to Cal. Civ. Code § 1780(d), I make this declaration in support of the Class Action Complaint and the claim therein for relief under Cal. Civ. Code § 1780(a).  I have personal knowledge of the facts stated herein and, if necessary, could competently testify thereto.

     2.     This action for relief under Cal. Civ. Code § 1780(a) has been commenced in a county that is a proper place for trial of this action because Nestlé Holdings, Inc., Nestlé USA Inc., Nestlé Purina PetCare Co. do business throughout the State of California.

     This declaration is signed under penalty of perjury under the laws of the State of California this 2 5 day of August 2015.

Robert Malone

803645 V1

## DECLARATION RE: CLRA VENUE

I, Esther Malone, do hereby declare and state as follows:

     1.    I am a party plaintiff in the above captioned action. Pursuant to Cal. Civ. Code § 1780(d), I make this declaration in support of the Class Action Complaint and the claim therein for relief under Cal. Civ. Code § 1780(a). I have personal knowledge of the facts stated herein and, if necessary, could competently testify thereto.

     2.    This action for relief under Cal. Civ. Code § 1780(a) has been commenced in a county that is a proper place for trial of this action because Nestlé Holdings, Inc., Nestlé USA Inc., Nestlé Purina PetCare Co. do business throughout the State of California.

     This declaration is signed under penalty of perjury under the laws of the State of California this 25 day of August 2015.

Esther Malone

803645 V1

1

## DECLARATION RE: CLRA VENUE

2   I, R. Grace Rodriguez, do hereby declare and state as follows:

3          1.       I am a party plaintiff in the above captioned action.  Pursuant to Cal. Civ. Code §

4   1780(d), I make this declaration in support of the Class Action Complaint and the claim therein for

5   relief under Cal. Civ. Code § 1780(a).  I have personal knowledge of the facts stated herein and, if

6   necessary, could competently testify thereto.

7          2.       This action for relief under Cal. Civ. Code § 1780(a) has been commenced in a county

8   that is a proper place for trial of this action because Nestlé Holdings, Inc., Nestlé USA Inc., Nestlé

9   Purina PetCare Co. do business throughout the State of California.

10          This declaration is signed under penalty of perjury under the laws of the State of California

11   this 25 day of August 2015.

12

13

14                                                              R. Grace Rodriguez

15

16

17

18

19

20

21

22

23

24

25

26

27

28

803533 V1