JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

MELANIE BARBER et al.,

Plaintiffs,

v.

NESTLÉ USA, INC., a Delaware Corporation; and NESTLÉ PURINA PETCARE CO., a Missouri Corporation,

Defendants.

Case No.: SACV 15-01364-CJC(AGRx)

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

## I. INTRODUCTION

Plaintiffs Melanie Barber, Robert and Esther Malone, and R. Grace Rodriguez bring this action against Nestlé USA, Inc., and Nestlé Purina Petcare Co. (together, "Nestlé") for violations of the California Unfair Competition Law ("UCL"), Cal. Bus. &

-1-

Prof. Code § 17200 *et seq.*, violations of the California Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, and violations of the California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.* Plaintiffs claim that Nestlé is obligated to inform consumers that some proportion of its cat food products may include seafood which was sourced from forced labor. Before the Court is Nestlé's motion to dismiss. For the following reasons, Nestlé's motion is GRANTED.

## II. BACKGROUND

Plaintiffs filed their Complaint on August 27, 2015. (Dkt. 1 ["Compl."].) The Complaint alleges that Nestlé markets and distributes the cat food "Fancy Feast." (*Id.* ¶ 2.) Fancy Feast comes in a number of different varieties, some of which include seafood caught in the waters between Thailand and Indonesia. (*Id.*) To source that seafood, Nestlé works with its Thai partner, Thai Union Frozen Products PCL ("Thai Union"). Thai Union receives large shipments of fish from "motherships," which are large boats that refrigerate and transport fish they receive, in turn, from numerous smaller fishing boats. (*Id.* ¶¶ 3–4.) The smaller fishing boats that provide fish to the motherships can evidently stay at sea for significant amounts of time, with little oversight over their operations. Both parties acknowledge that some proportion of the small fishing ships use forced labor, but that it is virtually impossible to say how pervasive the problem is. The Complaint, citing recent news reports, describes in considerable detail the horrific conditions experienced by individuals on the small fishing boats. (*Id.* ¶¶ 21–29.)

Nestlé does not disclose on its Fancy Feast products that some of the seafood used to make Fancy Feast is likely produced by forced labor. (*Id.* ¶ 9.) Plaintiffs, purchasers of Fancy Feast, allege that they would not have purchased the product had they realized that some of the seafood contained in Fancy Feast may have been sourced from forced labor in Southeast Asia. They bring causes of action for violations of the California

UCL, the CLRA, and the FAL, arguing that Nestlé is required to inform consumers of the likelihood that seafood found in Fancy Feast is produced using forced labor. (*Id.* ¶¶ 62–99.) They also seek to certify a class of similarly situated individuals. (*Id.* ¶¶ 51–61.) On October 19, 2015, Nestlé moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. 28.)

### III. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). When evaluating a Rule 12(b)(6) motion, the district court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994). The district court may also consider additional facts in materials of which the district court may take judicial notice, *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994), as well as "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading," *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled in part on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (stating that while a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, courts "are not bound to accept as true a legal

conclusion couched as a factual allegation" (citations and quotes omitted)). Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. In keeping with this liberal pleading standard, the district court should grant the plaintiff leave to amend if the complaint can possibly be cured by additional factual allegations. *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

**IV. ANALYSIS**

Nestlé moves to dismiss the Complaint on a number of grounds. It argues that Plaintiffs' claims are barred by the safe harbor doctrine, that Nestlé does not have a duty to disclose the desired information, that Plaintiffs' individual claims should each be dismissed because they fail to adequately allege violations of state consumer protection law, that Plaintiffs lack standing, that Plaintiffs fail to satisfy the strictures of Rule 9(b), and that Plaintiffs' desired disclosures violate the First Amendment. The Court concludes that Plaintiffs' claims are barred by the safe harbor doctrine and therefore declines to reach the remainder of Nestlé's arguments.[1]

---

[1] Both parties have submitted requests for judicial notice. (Dkt. 29; Dkt. 35.) Federal Rule of Evidence 201(b) authorizes courts to take judicial notice of facts that are "not subject to reasonable dispute" and that are "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." A document to which a complaint "refers extensively" or that "forms the basis of a plaintiff's claim" may be incorporated by reference. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). A court may "treat such document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss." *Id.* Defendants request that the Court take judicial notice of a number of news articles and other publications, including Nestlé documents, referenced in and incorporated by Plaintiffs' Complaint. Plaintiffs believe that the documents establish that seafood in Nestlé's Fancy Feast product does in fact come from forced labor, and that Nestlé represents in online documents that it does not. Such documents are incorporated by Plaintiffs' complaint and are appropriate for judicial notice. Additionally, Defendants request that the Court take judicial notice of portions of the legislative history of Cal. Civ. Code § 1714.43. Legislative history is an appropriate subject of judicial notice. *See Chaker v. Crogan*, 428 F.3d 1215, 1223 n. 8 (9th Cir. 2005). Plaintiffs request that the Court take judicial notice of two documents published by the United Nations. Such documents are published by a governmental entity and are not subject to reasonable dispute, and accordingly, they are appropriate for judicial notice. The parties' respective requests for judicial notice, (Dkt. 29; Dkt. 35), are therefore GRANTED.

### A. The Safe Harbor Doctrine

The California Supreme Court has held that "safe harbors" are created from liability under the UCL when "the Legislature has permitted certain conduct or considered a situation and concluded no action should lie." *Cel-Tech Comms., Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 182 (Cal. 1999.) If either of those conditions exists, "plaintiffs may not use the general unfair competition law to assault that harbor" by arguing that the permitted conduct (or omission) is unlawful. *Id. Cel-Tech* applied the safe harbor doctrine only to UCL claims, but other courts have recognized that the doctrine equally applies to claims under the CLRA and FAL. *Alvarez v. Chevron Corp.*, 656 F.3d 925, 933–34 (9th Cir. 2011) (applying the safe harbor doctrine to UCL and CLRA claims); *Pom Wonderful LLC v. Coca Cola Co.*, No. CV 08-06237 SJO(FMOx), 2013 WL 543361, at *5 (C.D. Cal. Apr. 16, 2013) (applying the safe harbor doctrine to UCL and FAL claims).

Here, Nestlé argues that a safe harbor from Plaintiffs' state law claims was created by the California Transparency in Supply Chains Act of 2010 ("Supply Chains Act"), Cal. Civ. Code § 1714.43. The Supply Chains Act requires any retailer who does business in California and has annual worldwide gross receipts exceeding $100 million to make specific disclosures on its website about efforts it makes to "eradicate slavery and human trafficking from its direct supply chain." *Id.* Specifically, a covered retailer must disclose whether it (1) engages in verification of product supply chains to evaluate and address risks of human trafficking and slavery; (2) conducts audits of suppliers to evaluate supplier compliance with company standards for trafficking and slavery in supply chains; (3) requires direct suppliers to certify that materials incorporated into its products comply with laws regarding slavery and human trafficking; (4) maintains internal accountability standards and procedures for employees or contractors who fail to meet company standards regarding slavery and trafficking; and (5) provides company

employees and management with training on human trafficking and slavery. *Id.* Importantly, the Supply Chains Act does not actually require covered retailers to *do* any of the five things listed above: they must simply say on their websites whether or not they do them. Plaintiffs do not allege that Nestlé does not comply with the Supply Chains Act. Instead, they argue that Nestlé is obligated to make additional disclosures at the point of sale regarding the likelihood that a given can of Fancy Feast product contains seafood sourced by forced labor. Nestlé argues that this claim is barred by the safe harbor doctrine because the California Legislature already considered the disclosures that large companies with potential forced labor in their supply chains need to make to consumers, and elected to not require the disclosures Plaintiffs seek now.

Nestlé points to a number of cases supporting this application of the safe harbor doctrine. For example, in *Ebner v. Fresh Inc.*, the plaintiffs alleged that a lip treatment product violated the UCL, CLRA, and FAL by only stating its net quantity, and not the quantity of product "reasonably accessible" to the consumer (the plaintiffs argued that although the product container held 4.3 grams of product, consumers could only get at about 3.3 grams of it). No. SACV 13-00477 JVS(RNBx), 2013 WL 9760035, at *1; *5 (C.D. Cal. Sep. 11, 2013). The district court applied the safe harbor doctrine and dismissed the claims. It noted that California and FDA regulations required only a statement of net quantity, not the statement of "quantity reasonably accessible to consumers" that the plaintiffs desired. The court reasoned that the limited regulations indicated that "both the FDA and the California legislature have decided that consumers will be adequately protected if a cosmetic label provides the net quantity of contents." *Id.* at *5. Accordingly, UCL, CLRA, and FAL claims could not survive. *Id.* at *6. Similarly, in *Alvarez v. Chevron Corp.*, plaintiffs alleged that the design of a gas pump was such that customers who purchased premium gasoline first received between two- and three-tenths of a gallon of whatever gasoline—potentially lower-grade—the customer before them had ordered, before the pump began to deliver the higher-grade

premium gasoline. Plaintiffs argued that this design violated the UCL and CLRA. *Alvarez v. Chevron Corp.*, 656 F.3d 925, 928 (9th Cir. 2011). The Ninth Circuit affirmed the dismissal of the claims, noting that California law "unequivocally permit[ted]" the design of the gas pump at issue, and that the defendants therefore had safe harbor from UCL and CLRA liability. *Id.* at 933–34. *See also Lopez v. Nissan N. Am., Inc.*, 201 Cal. App. 4th 572, 591–92 (dismissing UCL claims where a slightly inaccurate odometer fell within the accuracy requirements of California law because "the Legislature has implicitly determined that any slight injury to consumers [from slightly inaccurate odometers] does not outweigh the harm if more stringent requirements for precision were to apply"); *Loeffler v. Target Corp.*, 58 Cal. 4th 1081, 1126 (2014) (dismissing UCL claims when plaintiffs claimed a "consumer action should lie whether or not" a retailer complied with the provision under which the defendant sought a safe harbor); *Pom Wonderful LLC*, 2013 WL 543361, at *5 (dismissing UCL and FAL claims where allegedly misleading juice label complied with applicable regulations).

Plaintiffs respond that these cases are inapposite because they deal with situations where a statute *explicitly* permitted the conduct alleged to violate California consumer protection law. Here, Plaintiffs contend, the Supply Chains Act does not specifically authorize nondisclosure of the presence of forced labor in a supply chain, so Nestlé has not successfully found a safe harbor. Plaintiffs offer a number of cases in support of this argument. In *Aron v. U-Haul Co. of Cal.*, for example, the plaintiff claimed that a rental truck company violated the UCL and CLRA by charging a fee to customers who returned vehicles with *less* fuel than they were provided but refusing to refund customers who returned trucks with *more* fuel than they were originally provided. 143 Cal. App. 4th 796, 801 (Cal. Ct. App. 2006). Defendant U-Haul argued that the safe harbor doctrine barred the claims, pointing to a statute which permitted rental companies of passenger vehicles to administer a fee scheme like U-Haul's. But the court held that the passenger vehicle statute did not provide a safe harbor because, as a rental *truck* company, the

passenger vehicle statute at issue "d[id] not apply to [U-Haul's] rental operations." *Id.* at 804. Likewise, in *Klein v. Chevron U.S.A., Inc.*, a California statute that applied to "transactions involving 5,000 or more gallons of motor fuel" did not provide a safe harbor for claims relating to transactions involving less than 5,000 gallons because the statute "ha[d] no applications to [those] transactions." *See also Doe v. SuccessfulMatch.com*, 70 F. Supp. 3d 1066, 1081 (N.D. Cal. 2014) (no safe harbor where statute required posting of privacy policy on website and plaintiffs alleged that the website impermissibly made their information viewable on other websites); *Torres v. JC Penney Corp., Inc.*, No. 12-cv-01105 JST, 2013 WL 1915681, at *2–4 (N.D. Cal. May 8, 2013) (no safe harbor where statute imposed purity requirements for gold and silver items, and plaintiffs alleged that the items contained undisclosed rhodium).

Without question, the best case for Plaintiff's position is *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152 (9th Cir. 2012). There, a consumer saw an advertisement for a credit card. The advertisement did not mention that the card came with an annual fee. After successfully opening the card and paying the annual fee, the consumer sued, alleging that the advertisement's failure to advertise the annual fee violated the UCL. The defendant argued that it was protected by a safe harbor under a regulation called Regulation Z.[2] Regulation Z provided that once a credit card company created an advertisement advertising a finance charge, it was required to provide "additional disclosure," including an annual fee, if any. The Ninth Circuit concluded that this limited "trigger[]" did not provide a safe harbor from a claim that an advertiser should have provided an annual fee to begin with. *Id.* at 1167. Plaintiffs argue that *Davis*, along with the other cases cited above, stands for the rule that unless a statute or regulation specifically permits or requires conduct, that conduct cannot find a "safe harbor" under the UCL, CLRA, or FAL.

---

[2] 12 C.F.R. § 226.1 *et seq.*

As an initial matter, almost all of Plaintiffs' cases are easily distinguishable from the facts currently before the Court. In *Aron* and *Klein*, the defendants were attempting to claim a safe harbor under a law that did not even apply to them or to the transactions they had engaged in. Here, by contrast, the statute under which Nestlé seeks a safe harbor—§ 1714.43—undoubtedly applies to it. And *Torres* and *Doe* are distinguishable as well: there, the defendants alleged a safe harbor under laws that did not even speak to the conduct at issue. Only *Davis* is analogous to the facts here, but even the *Davis* Court was presented with a situation where a legislature had not spoken to the question of whether annual fee disclosures should be required on *all* credit card advertisements. Davis, 691 F.3d at 1167 (Regulation Z only discussed disclosure of an annual fee in the event of a "trigger[]" that required disclosure, and not otherwise). In the present case, California *has* spoken directly to the issue of what disclosures companies must make to customers about potential forced labor in their supply chains. As a result, *Davis* is not on all fours with these facts either.

At bottom, Plaintiffs argue that because the Legislature has not specifically permitted nondisclosure of the facts they would like, nondisclosure cannot possibly find a safe harbor.[3] But the trouble with this argument is that it ignores the California Supreme Court's counsel that safe harbors exist both if the Legislature has "permitted certain conduct" *and* if it has "considered a situation and concluded that no action should lie." *Cel-Tech Comms., Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 182 (1999). In *both* of those instances, the *Cel-Tech* Court explained, "courts may not override [the

---

[3] Plaintiffs put much weight on the California Supreme Court's statement that "[t]here is a difference between (1) not making an activity unlawful, and (2) making that activity lawful." *Cel-Tech*, 20 Cal. 4th at 183. But as an example of this principle, the California Supreme Court noted that "Penal Code section 211, which defines robbery, does not make murder unlawful. Most assuredly, however, that section does not also make murder lawful." *Id.* This is not a situation where Nestlé is pointing to one statute, which regulates one matter, in an effort to claim that it has safe harbor from liability on an entirely different matter. Instead, this is a situation where the Legislature specifically considered the question here—how much disclosure should companies with forced labor in their supply chains make to consumers, and how—and reached an answer contrary to the remedy Plaintiffs seek here.

Legislature's] determination" and "simply impose their own notions of the day as to what is fair or unfair." *Id.* Here, the Court is persuaded that the California Legislature considered the situation of regulating disclosure by companies with possible forced labor in their supply lines and determined that only the limited disclosure mandated by § 1714.43 is required.

This conclusion is supported both by the text of § 1714.43 and its legislative history. By its own terms, § 1714.43 requires disclosure to consumers—exactly the remedy Plaintiffs seek here. And the section carefully notes that it requires *only* the limited disclosures, and not even affirmative actions to combat human trafficking. *See* § 1714.43(c) (requiring companies only to "disclose to what extent, if any," they take steps to avoid slavery and human trafficking in supply chains). Additionally, the legislative history for SB 657, which was enacted as § 1714.43, is even clearer: the "Bill Analysis" states that the measure "does not . . . require the relative[ly] narrow number of designated large companies to do anything other than post specified information on their web sites and also make such information available to interested consumers." (Exh. M. at 517.) It continues to explain that § 1714.43 "merely requires the specified large business entities to make available to consumers information about whatever these business' <u>voluntary</u> efforts are . . . The bill leaves it to consumers to decide whether and how, if at all, they wish to use such information in their purchasing decisions." (Exh. M. at 508.) This mechanism is consistent with how the Bill Analysis describes the purpose of the law: to "ensure [that] interested California consumers have reasonable access to basic information to aid their purchasing decisions." (Exh. N at 524.) Under § 1714.43, companies are "still completely free to do anything they want about their efforts to fight human trafficking and slavery," including nothing at all, so long as they make the required disclosures. (Exh. M at 517–18.) This language is impossible to square with Plaintiffs' current contention that California consumer protection law requires companies to make disclosures beyond what § 1714.43 requires in order to adequately inform

California consumers. The fact of the matter is that the Legislature already decided what level of disclosure would be sufficient to adequately inform consumers, and codified that level of disclosure as § 1714.43.

Plaintiffs may wish—understandably—that the Legislature had required disclosures beyond the minimal ones required by § 1714.43. But that is precisely the sort of legislative second-guessing that the safe harbor doctrine guards against. *Cel-Tech*, 20 Cal. 4th at 182. California considered the very problem Plaintiffs identify, determining that businesses' responsibilities to inform consumers about the presence of forced labor in supply chains begin and end with the required disclosures in § 1714.43. It is not the place of this Court to permit that determination to be disturbed by a novel application of California consumer protection law.

### B.   Misrepresentations

At the hearing on this motion, apart from their claims that Nestlé is required to provide additional disclosures about the presence of forced labor in its supply chain, Plaintiffs also alleged that certain representations made by Nestlé on its website are false or misleading. Seeing no reason why false statements would be protected by the safe harbor doctrine, the Court will briefly review the allegedly misleading statements to determine whether Plaintiffs can plead a misrepresentation claim that does not depend on alleging that Nestlé is required to provide additional disclosures

The thrust of Plaintiffs' misrepresentation allegations is that Nestlé makes a number of statements online which would persuade a reasonable consumer that forced labor is not present in Nestlé's supply chains. Because Nestlé cannot actually verify that its supply chain is free of forced labor, Plaintiffs contend, Nestlé's online representations are misleading, at a minimum, or false. Plaintiffs specifically point to eight statements,

sourced from four separate documents, which they believe mislead consumers as to the presence of forced labor in Nestlé's supply chain.  The statements are:

- "[Nestlé] fully support[s] the United Nations Global Compact's guiding principles on human rights and labour and aim[s] to provide an example of good human rights and labour practices throughout [its] business activities." (Dkt. 29 Exh. G ["Corporate Business Principles"] at 177.)
- "[Nestlé] require[s] [its] supplies, agents, subcontractors and their employees to demonstrate honesty, integrity and fairness, and to adhere to [the Nestlé Supplier Code of Conduct]." (Corporate Business Principles at 175.)
- "[Nestlé] expects the Supplier to adhere to all applicable laws and regulations . . . and strive to comply with international and industry standards and best practices." (Dkt. 29 Exh. H ["Supplier Code"] at 185.)
- "[Nestlé] reserves the right to verify compliance with the [Supplier] Code." (Supplier Code at 185.)
- "The Supplier must under no circumstances use, or in any other way benefit, from forced labour." (Supplier Code at 186.)[4]
- "The [S]upplier shall be capable to disclose all the potential sources of primary origins (country of origin) associated with deliveries made.  Nestlé reserves the right to ask the supplier to create . . . full supply chain mapping back to origin to facilitate assessment of upstream supply chain compliance." (Supplier Code at 188.)
- "Suppliers will ensure [that] [t]here is no known sourcing from Illegal, Unreported and Unregulated (IUU) fisheries and vessels." (Dkt. 29 Exh. I "["Responsible Sourcing Guidelines"] at 206.)

---

[4] Nestlé defines "forced labour" as "any form of indentured servitude such as the use of physical punishment, confinement, threats of violence as a method of discipline or control such as retaining employees' identification, passports, work permits or deposits as a condition of employment." (Supplier Code at 186.)

- "Having the right policies, procedures and management systems is good and necessary, but it is not enough.  It is the implementation, how you behave on the ground and the relationships you establish with different stakeholders, which create the trust necessary to be successful over time, as a company and as a society." (Dkt. 29 Exh. J ["Nestle in Society Full Report"] at 420.)

Nestlé responds by arguing that these statements are aspirational and that when read in context, Nestlé's statements are actually a nuanced and correct summary of its efforts to combat forced labor.  For example, the Responsible Sourcing Guidelines acknowledge that not all suppliers will meet Nestlé's requirements immediately, and that "Nestlé will provide support to suppliers that are not yet able to comply" but who are "committed to becoming compliant over time and demonstrate continuous and tangible progress."  (Responsible Sourcing Guidelines at 195.)  This is consistent with Nestlé's stated aim for the Responsible Sourcing Guidelines themselves: "to guide Nestlé's suppliers to improve their practices where necessary."  (*Id.* at 194.)  Similarly, Nestlé's Supplier Code is replete with evidence that its requirements represent an ideal, and not necessarily a reality.  The Supplier Code makes clear that Nestlé "*ask*[*s*] [its] suppliers and their sub-tier suppliers" to comply with its requirements and that the "standards of the Code set forth *expectations*" for suppliers.  (Supplier Code at 185 (emphasis added).)  There is little question that at times, Nestlé's online documents set forth firm requirements for suppliers.  (*See* Responsible Sourcing Guidelines at 195 ("No use of forced or child labour."))  But no reasonable consumer who reads the four documents Plaintiffs identify in context could conclude that Nestlé's suppliers comply with Nestlé's requirements in all circumstances.  On the contrary, Nestlé seems to anticipate a certain level of non-compliance.  It is not shy about identifying for consumers the rules and expectations for its suppliers, but it does not mislead them into thinking that its suppliers abide by those rules and meet those expectations in every instance.  *See Ruiz v. Darigold, Inc.*, No. C14-1283RSL, 2014 WL 5599989, at *4 (W.D. Wash. Nov. 3, 2014)

(dismissing misrepresentation claim because "[e]ven if the Court considers the [language] on which plaintiffs' claims of misrepresentation and omission rely, when read in context they reflect nuanced assessments of the current situation, are aspirational statements, or have not been shown to be false in any material respect")  As a result, Plaintiffs have failed to plead a misrepresentation claim that would not be foreclosed by the safe harbor doctrine.

**IV.  CONCLUSION**

For the foregoing reasons, Plaintiffs' claims are each barred by the safe harbor doctrine.  Accordingly, Nestlé's motion to dismiss is GRANTED, and because amendment would be futile, the claims are DISMISSED WITH PREJUDICE.

DATED:     December 9, 2015

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE